418 July 16, 2026 No. 32

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

RAMON AMADOR-HERNANDEZ,
*Petitioner on Review.*

(CC 19CR56998; 19CR57003)
(CA A177568 (Control); A177569) (SC S071880)

En Banc

On review from the Court of Appeals.*

Argued and submitted January 13, 2026.

Shawn Evans Wiley, Deputy Public Defender, Oregon Public Defense Commission, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Jeff J. Payne, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief was Dan Rayfield, Attorney General, and Paul L. Smith, Interim Solicitor General.

BUSHONG, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

* Appeal from Multnomah County Circuit Court, Kelly Skye, Judge. 338 Or App 479 (2025) (nonprecedential opinion).

**BUSHONG, J.**

In this criminal case, we are asked to decide what it means for a parent to "withhold" food and dental care that is "necessary and adequate" for the parent's children under one of Oregon's criminal mistreatment statutes, ORS 163.205(1)(a), and whether there is sufficient evidence in this case to support defendant's convictions on two counts of first-degree criminal mistreatment. On appeal, defendant contended that there was insufficient evidence that he had knowingly withheld necessary and adequate food or dental care within the meaning of ORS 163.205(1), and that applying the criminal mistreatment law to these facts did "nothing more than criminalize poverty." *State v. Amador-Hernandez*, 338 Or App 479, 482 (2025) (nonprecedential opinion). The Court of Appeals disagreed and affirmed the convictions. We allowed defendant's petition for review and now affirm.

As we will explain, we have interpreted "withholds" in the criminal mistreatment statute to mean "keeps back," and the parties agree that a person must be able to access and provide food and care to withhold it from a dependent child. Poverty can certainly affect whether a person has that ability, but we agree with the Court of Appeals that the record here supports the conclusion that defendant was able to access and provide food for his children. Because food is essential to a child's growth and development, we interpret "necessary and adequate" food in this context to mean food that, at a minimum, is necessary and adequate to prevent severe and chronic malnutrition. Finally, we conclude that there was sufficient evidence in this record to support the trial court's conclusions that defendant acted *knowingly* when he withheld necessary and adequate food from both children and dental care from the youngest child.

Accordingly, we affirm the decision of the Court of Appeals and the judgment of the circuit court.

## I.  BACKGROUND

A.  *Facts*

In a criminal appeal challenging the sufficiency of the evidence to support a conviction, we review the evidence

in the light most favorable to the state to determine whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). We summarize the facts from the record consistent with that standard.

Defendant and his wife were jointly charged with two counts of first-degree criminal mistreatment, ORS 163.205. Counts 2 and 3 of the indictment alleged that defendant and his wife had intentionally and knowingly withheld necessary and adequate food, physical care, and medical attention from their daughters, G and T.[1]

The situation came to light after the Department of Human Services (DHS) obtained a warrant for protective custody of G and T, who were 8 and 9 years old at the time. The DHS caseworker, Constanza, testified that, when he first saw the girls, they were in a back bedroom that smelled like urine. Their clothes and skin were dirty, their hair was matted, and they "were really scared." Constanza called it "the worst chronic neglect case" he had seen in 14 years at DHS. He referred the children to CARES Northwest because of his concerns about their well-being.

A physician at CARES Northwest, Dr. Bishop-Perdue, examined both girls. Bishop-Perdue's reports stated that the medical evaluations for both girls were "significant for signs of malnutrition including small size, short statute, no subcutaneous fat stores and bitemporal wasting." Bishop-Perdue testified at trial that "bitemporal wasting" meant that "the muscles along the side of their face were much smaller than they should be." She further testified that both girls had "significant dental decay," and that G had multiple visible cavities, abscesses, and missing teeth, which made it painful for her to eat and made her vulnerable to "whole body infections." According to Bishop-Perdue's reports, both girls needed treatment for their "rotten teeth," and T had

---

[1] Count 1 of the indictment -- which alleged that defendant's wife committed first-degree criminal mistreatment against her daughter, JC -- did not charge defendant with a crime as to JC. Defendant was separately charged with and convicted of five counts of first-degree sexual abuse, ORS 163.427, against another stepdaughter, AC. Those convictions are not at issue here.

reported that she and her siblings "were hungry and there was [either] no food or bad, rotten food in the house to eat."

Bishop-Perdue concluded that G and T had been neglected for years, and that the neglect had already caused the children physical harm and risked causing long-term impairment of their physical and mental development. When asked whether a person without medical training would have noticed G's stunted growth and dental issues, Bishop-Perdue testified that a "nonmedically trained person would have noticed that [G] was very small and would have likely presumed that she was significantly younger based on how she presented and would have noticed her teeth." She also testified that the children had coverage through the Oregon Health Plan. According to Bishop-Perdue's reports, both girls suffered from "chronic" malnutrition, which, as she testified at trial, would have developed over the course of several years.

A counselor from the girls' elementary school, Nash-Sedda, testified that she had become increasingly concerned about the girls over time. She became very concerned when G started losing her hair and her dental problems made it painful for her to eat. Nash-Sedda testified that 97 percent of the students at the school were below federal poverty guidelines and, as a result, all students could receive free breakfast and lunch at school. But G and T did not fully benefit from the availability of those free meals because their school attendance was poor. For example, during the 2018-19 school year, they attended school 49 percent of the school year. The girls also told Nash-Sedda that "they weren't being fed at home." Nash-Sedda testified that she had spoken to defendant at one point about her concerns and he had expressed a desire "to do better," but nothing appeared to change.[2]

---

[2] Nash-Sedda also testified that the girls often came to school with "matted" hair and they "reeked" of urine. Teachers reported having a hard time having the girls in the classroom because of the urine smell, stating that the smell was "so profound" that other students had trouble being around them. Nash-Sedda explained that the girls' physical condition affected their ability to make friends because other students made comments about the urine smell or their matted hair. Although this evidence of neglect did not directly implicate whether defendant withheld food or dental care, as we will explain later, defendant's apparent willingness to ignore these obvious bodily care needs contributes to an inference

The state introduced additional evidence about the girls' home life. Defendant's stepdaughter, JC, was 16 years old when she testified at trial. JC testified that she was the person who would wake G and T up in the morning and try to get them to school. JC testified that there "wasn't much food in the house" and that the girls were hungry "pretty often." JC also testified that the girls "didn't really go to the dentist" and that both girls had "a lot" of toothaches. JC testified that defendant and her mother were intoxicated or drinking alcohol "pretty often," and that, when they were drinking, they "wouldn't really pay attention" to the girls. JC indicated that defendant was employed part of the time, doing construction work, and that he paid the rent "most of the time."

Another stepdaughter, AC, testified at trial; she was 20 years old at the time. AC testified that the family received food stamps and often relied on food banks for food. According to AC, "[s]ometimes" G and T would have enough to eat, but they were "behind in their nutrients." AC testified that defendant's money "did not always go to food" or to "what [they] needed" because it was "mostly [spent on] alcohol." She further testified that defendant and her mom would go out to the bar "almost every weekend" and that they would spend the money that defendant had earned on alcohol and gambling.[3] Finally, AC testified that G and T had never been taught to brush their teeth.

B.  *Procedural History*

Defendant waived his right to a jury and the case was tried to the court. After the state rested its case, defendant moved for a judgment of acquittal on both criminal mistreatment counts, contending that there was insufficient evidence that defendant had knowingly withheld necessary and adequate food and dental care from G and T in violation of ORS 163.205(1). The trial court denied the motion, concluding that the evidence, viewed in the light most favorable

---

that he acted "knowingly" in failing to provide necessary and adequate food and dental care to maintain the girls' bodily health.

[3] Of course, going to bars and spending money on alcohol and gambling is not criminal conduct, but it is relevant here because it supports the conclusion that defendant had resources available to him that he could have used to feed his children, and that he *knowingly* chose to use those resources for other purposes.

to the state, was sufficient to permit a reasonable finder of fact to find that the state had proved all the elements of the charges beyond a reasonable doubt. Defendant did not present any evidence. After closing arguments, the trial court found defendant guilty on both counts of first-degree criminal mistreatment.[4]

Defendant appealed, contending that the case required the court to construe what it means to "withhold[] necessary and adequate" food and dental care as that phrase is used in the statute, and that withholding necessary and adequate food and care requires more than neglect. Defendant acknowledged that the evidence would support a finding of neglect but argued that it was insufficient to prove that he had withheld necessary and adequate food and care in violation of ORS 163.205(1). Defendant also argued that the evidence of tooth decay was insufficient under Court of Appeals precedent to establish criminal mistreatment, citing *State v. Drown*, 245 Or App 447, 263 P3d 1057 (2011), *rev den*, 351 Or 401 (2011).

The Court of Appeals noted that defendant had assigned error to the denial of his motion for judgment of acquittal and understood defendant's appeal to be challenging only the sufficiency of the evidence. *Amador-Hernandez*, 338 Or App at 480. The Court of Appeals affirmed the convictions based on its evaluation of the sufficiency of the evidence, applying the standards that it had adopted in *Drown*, without engaging in a further statutory interpretation analysis. *Id.* at 480 (stating that, under *Drown*, "the standard of withholding necessary and adequate physical care can be satisfied by withholding care for a condition that causes or will cause serious physical pain or injury") (internal quotation marks omitted); *id.* at 482 (concluding that "the record contained sufficient evidence" to support the

---

[4] The trial court found persuasive the state's theory that defendant had knowingly withheld necessary and adequate food and dental care from G and T, and, applying Court of Appeals precedent, concluded that defendant's conduct constituted criminal mistreatment because it caused or was likely to cause serious physical injury. The court did not find persuasive the state's theory that defendant had knowingly withheld necessary and adequate medical attention for G's medical condition, concluding that there was insufficient evidence that G's condition caused or was likely to cause serious pain or physical injury as required by Court of Appeals' precedent.

trial court's determination that defendant had "knowingly withheld necessary and adequate food and dental care" from G and T and that defendant's actions had "caused or were likely to cause serious physical injury").

With respect to dental care, the court noted the evidence that both girls had significant dental decay, and that G had a "really bad tooth problem" that affected her ability to eat. *Id.* at 481-82. The court concluded that this case "has significant distinctions" from *Drown*, where there was "no evidence as to which children had toothaches, the severity of the aches, or any evidence that 'the children were experiencing symptoms that interfered with their daily activities or were likely to result in serious harm in the long term.'" *Id.* at 482 n 2 (quoting *Drown*, 245 Or App at 464-65). The court also stated that it took "seriously" defendant's argument that his convictions did "nothing more than criminalize poverty" but concluded that, because the record "includes evidence of the availability of food and dental care for the children, this is not a case of a parent who was simply unable to afford basic necessities." *Id.*

Defendant petitioned for review, contending that the first-degree criminal mistreatment statute, ORS 163.205(1)(a), required the state to prove that defendant affirmatively withheld food and care that he was able to provide and that, under *Drown*, the food and care that defendant withheld must have been "absolutely required" to meet the children's basic safety and survival needs. *See Drown*, 245 Or App at 464 (stating that "a person withholds necessary and adequate physical care when the person withholds care that is absolutely required to meet a dependent's basic safety and survival needs").[5] Defendant further contended that the evidence here was insufficient to meet that standard. We allowed review to address the statutory interpretation issue and whether the record contained sufficient evidence to support the convictions under our interpretation of the criminal mistreatment statute.

---

[5] Defendant does not contend on review that the Court of Appeals erred in applying *Drown* without engaging in any additional statutory interpretation analysis. Instead, defendant again raises the statutory interpretation issue in this court, elaborating on some of the arguments he had previously asserted in his brief in the Court of Appeals.

## II.   ANALYSIS

We review the interpretation of a statute for legal error, applying our familiar methodology that focuses on the statutory text, context, and any legislative history that we find to be helpful. *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). After interpreting the statute, we review the evidence in the record, in the light most favorable to the state, to determine whether there is sufficient evidence to allow a reasonable trier of fact to find that the state has proven the elements of the offense beyond a reasonable doubt. *State v. Walters*, 311 Or 80, 82-83, 804 P2d 1164 (1991).

We begin with the statutory interpretation issue.

A.   T*he Statutory Interpretation Issue*

ORS 163.205(1)(a) provides, in pertinent part:

> "A person commits the crime of criminal mistreatment in the first degree if:
>
> "(a)   The person, in violation of a legal duty to provide care for another person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of another person, intentionally or knowingly *withholds necessary and adequate food, physical care or medical attention* from that other person."

(Emphasis added.) The same phrase—"withholds necessary and adequate food, physical care or medical attention"— is also used in the second-degree criminal mistreatment statute, ORS 163.200(1)(a) and (b). ORS 163.200 and ORS 163.205 were enacted in 1973 as part of the same bill, Or Laws 1973, ch 627, §§ 2 and 3, and we refer to those statutes in this opinion as the criminal mistreatment statutes.

The main difference between first-degree and second-degree criminal mistreatment is the required mental state. Under ORS 163.200, a person commits second-degree criminal mistreatment if the person "withholds necessary and adequate food, physical care or medical attention" *with criminal negligence.* First-degree criminal mistreatment under ORS 163.205(1)(a) involves the same conduct done *intentionally or knowingly.*[6]

---

[6] In *Baker-Krofft*, we noted another difference between first-degree and second-degree criminal mistreatment:  the second-degree statute applies only

        We have determined that, to establish first-degree criminal mistreatment in violation of ORS 163.205, the state must prove three elements: (1) the defendant acted with the requisite mental state; (2) the defendant had a duty to provide care for a person; and (3) the defendant "withheld" necessary and adequate food, physical care or medical attention from that person. *State v. Baker-Krofft*, 348 Or 655, 660, 239 P3d 226 (2010). In *Baker-Krofft*, the defendants in two consolidated cases each had children under their care "who were well fed and healthy but who lived in homes with potential safety hazards." *Id.* at 658.[7] We concluded that those safety hazards "were not sufficient to give rise to criminal liability" for criminal mistreatment. *Id.* at 668.

        In reaching that conclusion, we outlined the elements of first-degree criminal mistreatment under ORS 163.205, as noted above. Defendant in this case does not dispute that he had a legal duty to provide care for G and T, nor does he dispute that "physical care or medical attention" can include dental care. Rather, defendant contends that he did not knowingly "withhold[]" food or dental care that was "necessary and adequate" as those terms are used in ORS 163.205.

        We begin with the meaning of the word "withhold." We interpreted "withhold" for purposes of ORS 163.205 in *Baker-Krofft* to mean "keep back" food, physical care, or medical attention from a dependent person. 348 Or at 662.[8] We explained that the criminal mistreatment statutes "rest on the premise that the actor keeps back something (food, physical care, or medical attention) from a person who would

---

to persons who have a duty to provide care for another, while the first-degree statute also applies to persons who assumed the permanent or temporary care, custody, or responsibility for the supervision of another person. 348 Or at 660 n 3. That difference does not affect the issues on review in this case.

    [7] Our opinion in *Baker-Krofft* addressed safety hazards in two separate cases. In one case, the "the house posed specific fire hazards," and in the other case, "the home was filled with debris, which included some small items on the floor that posed a potential choking hazard to the young children who lived in the home." 348 Or at 658.

    [8] In *Baker-Krofft*, we noted that "withholds" is a term of common usage, so we interpreted it in accordance with its ordinary meaning. 348 Or at 662. The dictionary defines "withhold" to mean "'to desist or refrain from granting, giving, or allowing : keep in one's possession or control : keep back.'" *Id.* (quoting *Webster's Third New Int'l Dictionary* 2627 (unabridged ed 2002)).

not otherwise be able to obtain it for him or herself." *Id.* In this case, the parties agree that we should apply the "keep back" definition of "withhold" that we adopted in *Baker-Krofft*, and they further agree that a person can "keep back" food or care only if the person had the ability to access and provide food and care.[9] Thus, the parties agree that "withholds" in ORS 163.205(1), as relevant here and consistent with our interpretation of that word in *Baker-Krofft*, means to "keep back" food or dental care that defendant had the ability to access and provide to his daughters. We agree with that interpretation.

In addition, however, defendant contends that "withholds" in ORS 163.205(1) means more than having the *ability* to access and provide food and care and *failing to provide* it to a dependent person. Defendant uses varying terms in articulating that argument. In his opening brief, defendant argued that the statute required the state to prove that he "purposely held back food from his children, as a form of punishment or otherwise" or "in a manner amounting to a cruel deprivation." In his reply brief, defendant argues that the statute "prohibits not the mere *failure* to provide, but the intentional or conscious *refusal* to provide necessary food and care" to his children, or that defendant "had the financial resources and access to purchase food or obtain medical care, but did not do so *in order to deny such food or care to G and T*." The "gravamen" of the statute, according to defendant, "is an intentional or knowing 'cruel deprivation'

---

[9] The parties follow different paths to get to that agreement. The state contends that a person must be capable of providing food and care to withhold it, because the minimum requirement for criminal liability is "the performance by a person of conduct which includes a voluntary act or the omission to perform an act *which the person is capable of performing*." ORS 161.095(1) (emphasis added). Defendant contends that a defendant must be capable of providing food and care to withhold it, because the criminal nonsupport statute, ORS 163.555, includes a defense that requires such an assessment. *See* ORS 163.555(3) (providing an affirmative defense for failing to provide child support if the defendant "has a lawful excuse for failing to provide child support"); *State v. Langford*, 90 Or 251, 260, 176 P 197 (1918) (interpreting a similar provision in a predecessor to ORS 163.555 to mean that "the obligation of the father must be measured with reference to his ability, honestly exercised, and with regard to his financial resources").

We need not rely on either ORS 161.085(1) or the "lawful excuse" provision in ORS 163.555 based on our conclusion that a person can "withhold" food or care in violation of ORS 163.205 only if the person "keeps back" food or care that the person is *able to access and provide* to a dependent person.

of necessary food or care at the level of a nursing home employee intentionally holding back a resident's medication or food as punishment."

Regardless of how it is worded, we understand defendant's argument to be that a person can "withhold" food and care from a dependent person only if the person could access and provide food and care to a dependent person *and chose not to do so for the specific purpose* of depriving the dependent person of the food or care that the person needs. That argument is refuted by the text of ORS 163.205(1), which applies when a person withholds food or care *intentionally or knowingly*.

*Intentionally* withholding food and care would include choosing to keep back food and care for the specific purpose of depriving a dependent person of necessary food or care, such as for a punishment or to be cruel.[10] But a person can violate ORS 163.205(1) by *knowingly* withholding necessary and adequate food or care without having that purpose. A person acts "knowingly" under the criminal code when "a person acts with an awareness" that the person's conduct is "of a nature" described in the statute, "or that the circumstance" described in the statute exists. ORS 161.085(8). In this context, defendant could withhold food *knowingly* if he acted "with an awareness" that his children needed food, he was aware that he was able to access and had a duty to provide it, and he was aware that he was not providing that food. And, as we will explain, under the standard adopted in *Drown*—with which we agree—defendant would also need to be aware that his failure caused or would cause severe malnutrition or serious pain, injury, or illness. Thus, defendant could knowingly withhold food from his children even if he did not choose to withhold food *for the specific purpose* of depriving them of it as a form of punishment, to be cruel, or to cause them pain, injury, or illness.

The parties' remaining dispute involves the meaning of "necessary and adequate" as applied, in this case, to food and dental care. In *Baker-Krofft*, we held that "a

---

[10] "Intentionally" is defined in the criminal code to mean that "a person acts with a conscious objective to cause the result or engage in the conduct" described in the criminal statute. ORS 161.085(7).

person withholds necessary and adequate physical care from a dependent person when the person keeps back from the dependent person *those physical services and attention that are necessary to provide for the dependent person's bodily needs.*" 348 Or at 666-67 (emphasis added). In reaching that conclusion, we noted that the legislature had grouped physical care "together with food and medical attention," which are both "essential to maintain bodily health." *Id.* at 663. That suggested that "the legislature understood that physical care was similarly limited to those physical services and attention *that are necessary to provide for a dependent person's bodily needs.*" *Id.* (emphasis added).

That observation suggests that withholding "necessary and adequate" food or medical attention in violation of the criminal mistreatment statutes means keeping back food or medical attention that, like physical care, was necessary to provide for a dependent person's bodily needs. As we noted in *Baker-Krofft*, food is essential to maintain a dependent person's bodily health. *Id.* Applying that same approach to withholding necessary and adequate *food* or *dental care* supports the conclusion that a person can withhold necessary and adequate food or dental care from a dependent person when the person keeps back from the dependent person food or dental care that is necessary to provide for the dependent person's bodily needs.

We further noted in *Baker-Krofft* that the services "necessary to maintain a person's bodily health will vary depending on the person's needs." *Id.* at 667 n 5. As examples, we noted that services necessary to maintain a dependent person's bodily health may include "periodically turning a bedridden person who is unable to move on her own so that she does not develop bed sores or maintaining a child or elderly person's personal hygiene so that the person does not develop infections or some other illness." *Id.*

This case involves the needs of defendant's children for food and dental care, and those needs are different. A child needs food to survive, grow, and develop physically and mentally, and to maintain their bodily health. At a minimum, there is no question that a parent must provide sufficient food to avoid starving their children to death or

nearly to death. The fact that the legislature criminalized a parent's withholding of food that is both "necessary and adequate" for a dependent child suggests that, in addition to requiring parents to provide sufficient food to avoid starving or nearly starving children to death, the legislature also understood—as we observed in *Baker-Krofft*—that food is "essential to maintain bodily health," and it is particularly essential for the growth and development of children. Thus, regardless of where the line is drawn between providing necessary and adequate food for a dependent child and *not* providing that food, the standard for establishing criminal mistreatment can be satisfied by showing that a parent withheld food to such an extent that it caused severe and chronic malnutrition.[11]

A child's needs for dental care may vary depending on the child. All children lose their baby teeth, and many children develop tooth decay in varying degrees of severity. Although we have not previously decided when a parent's failure to address their child's dental needs amounts to first-degree criminal mistreatment in violation of ORS 163.205, the Court of Appeals addressed that issue in some detail in *Drown*, 245 Or App 447. And the court's reasoning is persuasive.

There, the Court of Appeals reversed first-degree criminal mistreatment convictions that were based on a parent's failure to attend to the dental needs of four of her

---

[11] That conclusion follows from the ordinary meaning of the words "necessary and adequate." "Necessary" generally means "that [which] cannot be done without : that must be done or had : absolutely required : ESSENTIAL, INDISPENSIBLE." *Webster's* at 1510-11. However, this court has stated that "necessary" "is a word susceptible of various meanings." *State v. Young*, 74 Or 399, 406, 145 P 647 (1915). It "may import absolute physical necessity, or that which is only convenient or useful or essential." *Id.* Courts construing "necessary" have "almost universally" held it to mean "needful or convenient," especially "where the word is used in conjunction with other and stronger terms." *Id.*; *see also State ex rel Dept. of Rev. v. Capital Shelters*, 295 Or 561, 563, 668 P2d 1214 (1983) (holding that "necessary" in statute giving Department of Revenue power to subpoena records "whenever necessary" means "relevant to the purposes of a lawful investigation and the object of a demonstrable, practical need"). "Adequate" means "equal to, proportionate to, or fully sufficient for a specified or implied requirement." *Webster's* at 25. Food is "necessary" because it is essential to avoid starving to death, and "adequate" food would be food that is sufficient in both quality and quantity to avoid severe and chronic malnutrition or other serious illnesses.

dependent children.[12] The court concluded from the text, context, and legislative history of the criminal mistreatment statutes that the standard for withholding necessary and adequate physical care "can be satisfied by withholding care for a condition that causes or will cause serious physical pain or injury." *Id.* at 464. The court stated that failing to treat pain and physical injuries "can constitute criminal mistreatment, but whether it does depends on the nature of the pain or injury, including the intensity, duration, and consequences of the pain or injury[.]" *Id.* at 464.

Applying that standard to dental care, the court noted that the evidence in *Drown* established that four of the defendant's dependent children required dental work after they were taken into DHS custody. Specifically, there was evidence that two of the children needed fillings, and two needed root canals. *Id.* at 464. Although there was some evidence that some of the children had toothaches at times, there was no evidence "regarding the severity—either in degree or duration—of the toothaches." *Id.* at 465. Thus, the court concluded, "there was no evidence from which a rational trier of fact could find that any of the children suffered serious physical pain or injury from the toothaches." *Id.* The court noted, for example, that there was no evidence "that the children were experiencing symptoms that interfered with their daily activities or were likely to result in serious harm in the long term." *Id.*

We agree with the Court of Appeals' approach to determining whether a parent's failure to attend to a dependent child's dental needs amounts to criminal mistreatment. The text of the statute, as we interpreted it in *Baker-Krofft* and consistent with the Court of Appeals' interpretation in *Drown*, suggests that a parent withholds dental care that is "necessary and adequate" for a dependent child in violation of the criminal mistreatment statutes when the parent does not take any action to address severe dental problems that cause or will cause the child serious pain or other significant

---

[12] The defendant in *Drown* was charged with assault and criminal mistreatment of her nine youngest dependent children. On the criminal mistreatment charges, the state presented evidence that the family's home was "cramped and cluttered" and that defendant "had failed to take the children for routine medical and dental examinations or have them immunized." 245 Or App at 451.

and lasting symptoms that interfere with the child's daily activities or are likely to result in serious harm in the long term.[13]

Defendant makes two additional arguments based on the context of the criminal mistreatment statutes. Defendant first points out that the context includes civil statutes that existed when the legislature enacted the criminal mistreatment statutes in 1973 that allowed the agency (then known as the Children Services Division) and juvenile courts to intervene and provide for children whose basic needs were not being met by their parents. *See Baker-Krofft*, 348 Or at 663 (noting as a contextual clue that, when the legislature enacted the criminal mistreatment statutes in 1973, "it did so against a backdrop of civil statutes that authorized juvenile courts to take jurisdiction over children 'whose conditions or circumstances are such as to endanger their own welfare' and make them wards of the court" (quoting ORS 419.476 (1)(c) (1971) (internal alterations omitted))). According to defendant, that context demonstrates that the legislature intended "withholds" as it is used in ORS 163.205 to mean more than neglect or a failure to provide food and care sufficient to justify intervention by DHS and the juvenile court.

We agree that neglect sufficient to justify intervention by DHS and the juvenile court may not necessarily amount to criminal mistreatment, but we do not agree that that requires us to interpret "withholding necessary and adequate food, physical care or medical attention" in the criminal mistreatment statutes any differently than we have. As we explained in *Baker-Krofft*, those civil statutes supported our conclusion that the legislature did not intend to "sweep within" the criminal mistreatment statutes "all the safety risks within a home that can give rise to juvenile court jurisdiction." 348 Or at 664. Rather, the legislature

---

[13] In *Drown*, the Court of Appeals also rejected the defendant's argument that the evidence did not support a finding that she *knowingly* withheld necessary and adequate care from another child, D, who had severe vision problems. The court noted "the degree of D's vision problems -- he was legally blind and could not see to read -- and the fact that those problems were apparent to others[.]" 245 Or App at 461. Under those circumstances, the court concluded that "a rational trier of fact could find that [the] defendant knew D needed vision correction in order to go about his daily tasks safely." *Id.* at 461-62.

"left the sort of [safety] risks at issue in [*Baker-Krofft*] to the civil law, with its salutary focus on protecting the child while working to reunite the family." *Id.* But we distinguished safety risks from a parent's withholding of food. We noted that the "civil and criminal statutes may overlap in some circumstances." *Id.* As an example, we stated that, "if a parent intentionally withheld necessary and adequate food from his child, that conduct could give rise both to juvenile court jurisdiction and also to criminal liability." *Id.*

Defendant's other contextual argument is based on criminal statutes that existed when the legislature enacted the criminal mistreatment statutes in 1973. As defendant points out, the criminal code that Oregon adopted in 1971 already included three provisions that addressed the subject of a parent's failure to care for a dependent child. *See* Or Laws 1971, ch 743, § 173 (child abandonment, now codified at ORS 163.535); § 174 (child neglect, now codified at ORS 163.545[14]); § 175 (criminal nonsupport, now codified at ORS 163.555).

Two of those statutes cover conduct that could also come within the criminal mistreatment statutes in some circumstances.[15] As enacted, the child-neglect statute, ORS 163.545(1) (1971), provided:

> "A person having custody or control of a child under 10 years of age commits the crime of child neglect if, with criminal negligence, he leaves the child unattended in or at any place for such period of time as may be likely to endanger the health or welfare of such child."

Thus, child neglect under that statute included criminally negligent conduct, as well as intentional, knowing, or

---

[14] The child neglect statute that was adopted in 1971 was amended in 1991, to specify that the conduct prohibited by the statute constituted second-degree child neglect. That change was necessary because the legislature created a new crime of first-degree child neglect, ORS 163.547, to prohibit persons from allowing children to be around certain illegal activities involving controlled substances. Or Laws 1991, ch 832, § 2.

[15] The child abandonment statute applies if a parent, lawful guardian, or other person lawfully charged with the care or custody of a child under 15 years of age, "deserts the child in any place with intent to abandon it." ORS 163.535(1). Defendant does not explain how criminal mistreatment in violation of ORS 163.200 or ORS 163.205 could also constitute "abandonment" in violation of ORS 163.535.

reckless conduct. *See* ORS 161.115(3) (stating that, if a statute describes the culpable mental state as criminal negligence, that mental state "is also established if a person acts intentionally, knowingly or recklessly").

The criminal nonsupport statute, ORS 163.555 (1971), provided in relevant part:

> "A person commits the crime of criminal nonsupport if, being the parent, lawful guardian or other person lawfully charged with the support of a child under 18 years of age, born in or out of wedlock, he refuses or neglects without lawful excuse to provide support for such child."

"Support" was defined by ORS 163.505(2) (1971), to include "necessary and proper shelter, food, clothing, medical attention and education."[16]

As enacted, the criminal nonsupport statute did not specify a culpable mental state, but it did state that it applied to a person who "refuses or neglects without lawful excuse" to provide support for a child, ORS 163.555. In contrast, first-degree criminal mistreatment applies to a person who intentionally or knowingly "withholds" necessary and adequate food, physical care or medical attention from a child, ORS 163.205, and second-degree criminal mistreatment applies to a person who engages in the same conduct with criminal negligence.[17] Criminal nonsupport and first-degree criminal mistreatment are both class C felonies, and the statutes overlap in some respects, but differ in others. For example, "refusing" to provide support is like "withholding" such support; both involve volitional acts. But "neglects" as used in the criminal nonsupport statute

---

[16] The legislature amended the criminal nonsupport statute in 2005, changing "refuses or neglects without lawful excuse" to "knowingly fails to" provide support for a child that the person is legally required to support. Or Laws 2005, ch 502, § 1. The legislature also deleted "without lawful excuse" and made a "lawful excuse" an affirmative defense. *Id.*

[17] First-degree criminal mistreatment under ORS 163.205 differs from second-degree criminal mistreatment under ORS 163.200 in terms of the culpable mental state. Both statutes apply to the act of "withholding" food and medical attention that is "necessary and adequate" to a dependent person. That act constitutes first-degree criminal mistreatment if it is done "knowingly or intentionally," ORS 163.205(1), while it constitutes second-degree criminal mistreatment if it is done "with criminal negligence," ORS 163.200(1). Second-degree criminal mistreatment is a class A misdemeanor.

as enacted in 1971 may be different: failing to provide necessary support, perhaps even negligently—without taking any affirmative act—could have been sufficient to establish neglect,[18] while first-degree criminal mistreatment requires an intentional or knowing "withholding" of food and care. And "necessary and adequate food, physical care or medical attention" describes specific categories of "support."

Thus, we acknowledge that there is some overlap among those statutes, and some conduct could be considered a violation of multiple provisions. Defendant contends that we should presume as a matter of statutory interpretation that, when the legislature enacted the criminal mistreatment statutes in 1973, it did not intend to criminalize *any* conduct that was already a crime under the criminal nonsupport statute that existed at that time. Thus, defendant argues, we should understand the legislature to have intended that the crime of first-degree criminal mistreatment would require proof that defendant was able to provide food and dental care that his children needed for their survival, but he chose not to provide them with that food and dental care for the specific purpose of cruelly depriving them of the food or care that they needed, such as for punishment. By contrast, the criminal nonsupport statute only required proof that the defendant knowingly failed to provide support—which could include food and dental care—to his children.

We disagree with defendant's interpretation of the criminal mistreatment statutes.

There is no principle of statutory interpretation that requires us to presume that a newly enacted statute was intended to address only conduct that was not already addressed by existing statutes. Rather, we have recognized that it is not uncommon for there to be "multiple statutory

---

[18] We did not address whether criminally negligent conduct would have been sufficient to establish that a person unlawfully "neglected" to provide support in violation of the criminal nonsupport statute as it was enacted in 1971, and, as noted, the legislature amended that statute in 2005 to delete the "neglects" provision and require a "knowing" mental state to establish criminal nonsupport. But criminally negligent conduct was enough to establish a violation of the child neglect statute as enacted in 1971, and it is enough to establish second-degree child neglect under the current statute, ORS 163.545(1).

violations based on the same conduct or criminal episode[.]" *State v. Gensitskiy*, 365 Or 263, 273, 446 P3d 26 (2019). *See also State v. Ofodrinwa*, 353 Or 507, 520, 300 P3d 154 (2013) (stating that "nothing prevents the legislature from enacting duplicative or overlapping statutes, but we ordinarily hesitate to attribute that intent to the legislature"). In *Ofodrinwa*, for example, we noted that, when using age as the basis for classifying degrees of sexual offenses, the legislature has provided that persons "under" a specified age lack the capacity to consent. As a result of that drafting technique, "the same act—intercourse with an 11-year-old child—can be charged as first-degree rape, second-degree rape, third-degree rape, and second-degree sexual abuse." *Id.* at 531 n 24.

Although we "hesitate" to attribute the intent to enact duplicative or overlapping statutes to the legislature, *Ofodrinwa*, 353 Or at 520, we have interpreted criminal statutes to be limited to "filling a gap" in existing law only where there was evidence in the statutory text, context, or legislative history demonstrating that the legislature intended to limit the scope of the new legislation in that way.

For example, in *State v. Gonzalez-Valenzuela*, 358 Or 451, 365 P3d 116 (2015), we interpreted the intended scope of the criminal endangerment statute, ORS 163.575, which made it unlawful for a person to knowingly permit a child "to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted." *Id.* at 453 (quoting ORS 163.575(1)(b)). The defendant in that case was charged with two counts of child endangerment in violation of ORS 163.575—in addition to being charged with unlawful possession of heroin, methamphetamine, and a controlled substance—when she possessed those substances in a container in her purse while in a car with her two children. We held that the defendant was entitled to a judgment of acquittal on the child endangerment charges.

In reaching that conclusion, we explained that "[t]he child endangerment statute is part of a patchwork of statutes intended as continuation of a previous statute prohibiting contributing to the delinquency of a minor[.]" *Id.*

at 469 (citing *former* ORS 167.210 (1969), *repealed by* Or Laws 1971, ch 743, § 432). After this court had held that the contribution statute was unconstitutionally vague, *State v. Hodges*, 254 Or 21, 28, 457 P2d 491 (1969), the legislature—following a recommendation from the Criminal Law Revision Commission—had enacted the criminal endangerment statute, among others, "to ensure the continuing criminality of conduct previously prohibited under the contribution statute[.]" *Gonzalez-Valenzuela*, 358 Or at 469 (citing Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, 162 (July 1970)). In so doing, we noted that the Commission had recognized that, "'in almost every instance the same conduct could be prosecuted' under other sections of the proposed criminal code.'" *Id.* at 469-70 (quoting Commentary at 162). We explained that "[t]he child endangerment statute was intended to fill gaps left by those other sections and, therefore, was 'designed to provide coverage for specific acts injurious to the welfare of minors not specifically prohibited elsewhere in the proposed Code.'" *Id.* at 470 (quoting Commentary at 178). *See also State v. McBride*, 352 Or 159, 165, 281 P3d 605 (2012) (concluding from the text and legislative history of the child endangerment statute that its "focus is on permitting a minor to enter or remain in a place where illegal drug activity is occurring; it is not on the act of engaging in illegal drug activity with minors present").

Here, there is no comparable evidence that the legislature intended only to "fill gaps" in the existing laws protecting children when it enacted the criminal mistreatment statutes. Rather, it intended to enact protections for a class of victims that included—but was broader than—those covered by existing laws protecting children and capturing a more limited range of harms to child victims than the harms covered by other statutes. We have recognized that at various times, the legislature has "put its mind to the deprivations of which * * * children are alleged to be victims and has attempted to remedy" those situations "by enacting a vast panoply of procedures, both civil and criminal, to ensure that children receive proper nurturing, support and physical care." *Burnette v. Wahl*, 284 Or 705, 710, 588 P2d

1105 (1978).[19] Statutes adopted by the legislature as part of that panoply of procedures or any "comprehensive plan" to furnish children "with parental nurturing and physical care" may overlap, because "no plan established by the legislature over a period of years can ever have perfect symmetry." *Burnette*, 284 Or at 714. *See also Baker-Krofft*, 348 Or at 664 (recognizing that civil and criminal statutes designed to protect dependent children "may overlap in some circumstances"). As we will explain, there is no evidence in the legislative history of the criminal mistreatment statutes, ORS 163.200 and ORS 163.205, that the legislature intended only to fill a gap in existing law without any overlap.

We summarized the relevant legislative history in *Baker-Krofft*, 348 Or at 664-66. As noted, the criminal mistreatment statutes, ORS 163.200 and ORS 163.205, were first enacted in 1973. Or Laws 1973, ch 627, §§ 2, 3. The bill, Senate Bill (SB) 780, as originally proposed, "made anyone who 'cruelly mistreats or maltreats any person over the age of 65 years' guilty of a misdemeanor." *Baker-Krofft*, 348 Or at 664 (quoting Bill File, Special Committee on Aging, SB 780 (1973)). Senator Fadeley introduced the bill "in response to reports of nursing home abuse and to protect residents of those facilities." *Id.* He indicated that, as originally proposed, the bill did not "'go as far as the child neglect bill [enacted in 1971 did].'" *Id.* (quoting Tape Recording, Special Committee on Aging, SB 780, April 9, 1973, Tape 4, Side 2 (statement of Senator Edward Fadeley)). Senator Fadeley "distinguished SB 780 from the child neglect laws, which he described as making it a crime to leave a child 'unattended at any place where it may be likely to endanger [the child's] welfare.'" 348 Or at 665. As Senator Fadeley explained, SB 780 was not "'going to that [level].'" *Id.* Instead, he explained, the bill was addressing "'some action or nonaction * * * that resulted in cruel deprivation or the undue threat of fear.'" *Id.* Thus,

---

[19] In *State v. Sparks*, 267 Or App 181, 202, 340 P3d 688 (2014), the Court of Appeals summarized the differences "between the categories of offenders to which those various criminal statutes concerning the welfare of children apply." Child neglect, whether in the first or second degree, applies "only to persons having custody or control of a child, whereas child abandonment and criminal nonsupport apply to parents, lawful guardians or other persons charged with, in the case of abandonment, the care and custody of a child, or, in the case of criminal nonsupport, with the support of a child." *Id.* at 201-02 (internal quotation marks omitted).

the bill as originally proposed "was intended to focus more narrowly on withholding food and other necessities from seniors." *Id.*

After vagueness concerns arose, Senators Fadeley and Carson redrafted the bill. *Id.*[20] A Senate committee considered the redrafted bill at two subsequent hearings, but, as we noted in *Baker-Krofft*, "[n]o tape recordings of those hearings exists, and the minutes of those hearings do not provide any guidance on the meaning of the redrafted bill." *Id.* at 665. The redrafted bill removed "cruelly mistreats or maltreats" from the bill and expanded the scope of the legislation to protect *all* dependent persons—not just those over 65. That resulted in a redrafted bill that was "substantially in the same form" as the bill that the legislature enacted, now codified at ORS 163.200 and 163.205. *Id.* As we explained in *Baker-Krofft*, the redrafted bill "applied to dependent persons generally while specifying more particularly the actions that the bill prohibited—withholding necessary and adequate food, physical care, and medical attention." *Id.* But, as we noted in *Baker-Krofft*, "[t]he only explanation of the redrafted bill [in the legislative history] comes from Senator Carson's discussion of the bill before the full Senate." *Id.*

In that discussion, Senator Carson first referred to testimony that had been presented to the committee about abuse of elderly persons in assisted living facilities. *Id.* (citing Tape Recording, Senate Floor, SB 780, June 29, 1973, Tape 32, Side 1 (statement of Senator Wallace P. Carson)). He then stated that the bill before the Senate was "a little different than the bill that was originally introduced," but he believed that "it goes to the same point." *Id.* He explained that "people can hurt other people by intentionally or negligently

---

[20] One of the vagueness concerns was the original bill's use of the phrase "cruelly mistreats or maltreats." One committee member suggested that the bill should not use that phrase because it would be subject to "interpretation by the jury" to see if the conduct was "truly cruel mistreatment or not." Tape Recording, Special Joint Committee on Aging, SB 780, April 9, 1973, Tape 4, Side 2 (unidentified committee member). Another concern was the fact that the bill only applied to people over the age of 65. Senators Carson and Fadeley discussed the fact that other dependent people "also get mistreated" and proposed expanding the bill to cover anyone who depends on others for care. Tape Recording, Special Joint Committee on Aging, SB 780, April 9, 1973, Tape 4, Side 2 (colloquy between Sen. Wallace Carson and Sen. Ed Fadeley).

withholding adequate food, physical care or medical attention from the people when they have an affirmative duty to provide that attention." *Id.* at 665. He further explained that the existing criminal code already "takes care of" physical abuse, *id.*, but that it "perhaps did not speak directly" to "nonfeasance rather than malfeasance, in other words, where it's withholding of some food or some other thing[.]" *Id.* at 666. Senator Carson did not address whether conduct constituting "nonfeasance" could already be covered by the existing criminal nonsupport statute, which, as noted above, would have applied to a parent's failure to support a dependent child. He ended by explaining the difference between first- and second-degree criminal mistreatment under the bill, stating that second-degree criminal mistreatment "relates to negligently or unintentionally" withholding necessary services from a dependent individual, while first-degree criminal mistreatment applies to "intentionally" withholding those services.[21] *Id.*

As we stated in *Baker-Krofft*, the Senate voted to pass the bill immediately after Senator Carson's comments, the House also passed it, and the Governor signed it into law. *Id.* We noted "two observations regarding the legislative history." *Id.* First, Senator Carson had explained that the criminal mistreatment statutes "prohibit withholding specific services"—food, physical care, or medical attention. *Id.* That explanation was "at odds with the state's position that the statutes criminalize any and all acts that create or fail to correct a future safety risk." *Id.* Second, we noted that the examples of the type of conduct that would be prohibited by the statutes "involved the failure to provide essentials, such as food, from dependent persons." *Id.* at 666. "Nowhere in the available legislative history does anyone mention creating or failing to correct environmental dangers as the focus of the bill." *Id.* We concluded that "the legislative history is consistent with" the view of the statutes that we drew from their text and context and held that "a person withholds necessary and adequate physical care from a dependent person when the person keeps back from the dependent person those

---

[21] Although Senator Carson only mentioned "intentional" conduct when he described the first-degree criminal mistreatment bill on the Senate floor, the bill as enacted applies to conduct engaged in intentionally or knowingly. ORS 163.205(1).

physical services and attention that are necessary to provide for the dependent person's bodily needs." *Id.* at 666-67.

By contrast with the safety risks at issue in *Baker-Krofft*, this case involves the withholding of food needed by defendant's dependent children. Nowhere in the legislative history of the criminal mistreatment statutes does anyone suggest that withholding food from a dependent child was not intended to be covered by the legislation if that conduct would also be prohibited by the existing child neglect or criminal nonsupport statutes. To the contrary, we noted in *Baker-Krofft* that the criminal mistreatment statutes were intended to cover "the failure to provide essentials, such as food, from dependent persons." *Id.* at 666.

In summary, we conclude from the text, context, and legislative history of the criminal mistreatment statutes, as interpreted in *Baker-Krofft*, that a defendant withholds necessary and adequate food, physical care, or medical attention from a dependent person in violation of ORS 163.205(1), when the defendant keeps back from the dependent person food, physical care, or medical attention that the defendant is able to access and provide and that the dependent person needs to provide for their bodily needs. To constitute criminal mistreatment, the withholding of food, physical care, or medical attention need not be purposefully "cruel," but it must cause the dependent person serious pain, injury, or illness. Withholding food from a dependent child to such an extent that it causes severe and chronic malnutrition would certainly meet that standard.

We are not persuaded that the legislature intended to exclude from prosecution for criminal mistreatment a person who could also be prosecuted for child neglect or criminal nonsupport for the same conduct. But we agree with the parties that a person cannot be convicted of criminal mistreatment if the person does not have the ability to access and provide the food, physical care, or medical attention that is needed to provide for the dependent person's bodily needs. And a person can be convicted of criminal mistreatment only if the person acted with the requisite culpable mental state when they withheld necessary and adequate food, physical care, or medical attention from a dependent person.

We turn to whether the evidence in this case was sufficient to support the trial court's finding that defendant *knowingly* withheld necessary and adequate food and dental care from his dependent children.

B. *The Sufficiency of the Evidence of Criminal Mistreatment in this Case*

Defendant acknowledges that the record contains evidence that the girls' severe malnutrition and dental problems would not have occurred without years of neglect, and that such evidence may have been sufficient to establish that defendant had failed to provide food and care for purposes of ORS 163.555, the criminal nonsupport statute. But defendant points out that the defendant did, at times, provide food for the children, they had access to free lunches at school, and the family was on food stamps and occasionally obtained food from food banks. Defendant argues that there was no evidence that he ever *prevented* the girls from eating or that he ever "held back" food as a punishment. And defendant points out that, on one occasion, when one of the children developed a severe toothache, defendant took her to the dentist, who pulled the tooth.

From that evidence, defendant concludes that the record does not permit an inference that defendant "kept back" food or dental care that defendant was able to access and provide. Alternatively, defendant argues that the family's "food insecurity" and the condition of the children did not constitute the type of "extreme deprivation" of food that the statute was designed to prevent. Defendant acknowledges that the evidence of financial instability and irresponsibility, and the resulting concerns about the long-term health and safety of the children, supported a finding of neglect and justified DHS taking protective custody of the children, but defendant argues that the evidence did not support a finding that defendant engaged in any specific conduct that resulted in the type of severe deprivation required for first-degree criminal mistreatment.

We disagree.

We begin with the sufficiency of the evidence that defendant withheld necessary and adequate food from his

children. We have already determined that the statute did not require the state to prove that defendant "kept back" food to punish the children or otherwise acted for the specific purpose of cruelly depriving them of food. And we have determined that failing to provide food to such an extent that, over time, it caused severe chronic malnutrition is enough to establish that defendant withheld necessary and adequate food from his children, *if* defendant was able to access and provide food and knowingly failed to do so.[22] The fact that defendant provided *some* food to the children on occasion does not preclude a finding that he failed to provide *adequate* food, as evidenced by the girls' severe malnutrition, nor does it compel a finding that he was incapable of providing more.

We agree with the Court of Appeals that there is sufficient evidence in the record to support a conclusion that defendant was *able* to access and provide food; that is, "this is not a case of a parent who was simply unable to afford basic necessities." *Amador-Hernandez*, 338 Or App at 482. JC and AC both testified that defendant and his wife had money to go out on weekends, spending whatever money defendant had earned on alcohol, gambling, and other items that they consumed or wanted for themselves instead of buying food for their children. JC and AC's testimony supports the conclusion that defendant was *able* to access food and provide it to his daughters but did not because he prioritized discretionary spending for himself and his wife. The evidence also shows that defendant had access to food stamps and food banks, and that the girls received free lunches at school when they attended. But the evidence that their frequent absences kept them from getting food at school and the fact that both girls developed severe malnutrition that took several years to set in supports the inference that defendant did not use those available resources to provide necessary and adequate food for the children.[23]

---

[22] As we noted earlier, Dr. Bishop-Perdue testified that both girls suffered from chronic malnutrition resulting from years of neglect, and that their severe malnutrition was obvious from their physical appearance. The school counselor, Nedda-Smith, testified that both girls had complained about not getting enough food to eat at home. Defendant's stepdaughters, JC and AC, confirmed in their testimony that G and T often did not have enough food to eat.

[23] In concluding that withholding food to such an extent that it causes severe malnutrition can amount to criminal mistreatment, we do not mean to suggest

With respect to dental care, the fact that defendant took a child to the dentist on *one occasion* does not preclude a finding that he failed to provide necessary and adequate dental care.[24] There is evidence in the record that *both* girls suffered from severe dental decay, but the evidence as to the severity of their dental problems was different.[25] Bishop-Perdue testified that G had multiple visible cavities, abscesses, and missing teeth, which made it painful for her to eat and made her vulnerable to "whole body infections." Nedda-Smith confirmed that G's dental problems made it difficult for her to eat. Thus, the evidence was sufficient to support a finding that defendant withheld care for dental problems that caused G serious physical pain, interfered with her ability to eat, and could have led to additional pain and infections in the future. We conclude that, as to G, the evidence is sufficient to meet the standard for withholding necessary and adequate dental care that we have established.

We reach the opposite conclusion regarding T. Although there was evidence establishing that she had significant dental decay and occasionally had toothaches, there was no evidence that T's dental problems made it painful for her to eat or made her susceptible to illness or infections. Nor was there any evidence of the severity or duration of T's toothaches. Thus, the evidence regarding T's dental problems was comparable to the evidence that the Court of Appeals had found to be insufficient in *Drown*, 245 Or App at 464, to constitute criminal mistreatment based on a parent's failure to provide dental care.

----

that withholding food on one occasion, or even multiple occasions, will constitute criminal mistreatment. Parents might send a child to bed without dinner, for example, without being exposed to liability for criminal mistreatment. But withholding food that, over time, causes a child to suffer from severe and chronic malnutrition is enough to constitute criminal mistreatment.

[24] Again, a parent's failure to address a child's dental needs on one or more occasions may not amount to criminal mistreatment. But a knowing prolonged failure to address obvious and severe dental problems that cause significant pain, interfere with a child's ability to eat, and make the child more susceptible to infections or other illnesses can be sufficient to constitute criminal mistreatment.

[25] As noted previously, Dr. Bishop-Perdue testified that both girls suffered from "significant dental decay," and JC testified that the girls did not go to the dentist and that both girls had "a lot" of toothaches. AC testified that the girls were not taught to brush their teeth.

That conclusion does not change the disposition of this case. Defendant was charged with one count of first-degree criminal mistreatment regarding T in violation of ORS 163.205(1). That statute makes it a crime to knowingly withhold necessary and adequate "food, physical care *or* medical attention" from a dependent child. Although the indictment alleged that defendant had knowingly withheld "food, physical care *and* medical attention" from T, proof that defendant knowingly withheld any one of the three categories listed in the statute—food, physical care, or medical attention—is sufficient to support a conviction. *See State v. Soasey*, 237 Or 167, 171, 390 P2d 190 (1964) (holding that where "[t]he statute is in the disjunctive" and the "indictment is in the conjunctive ***, [p]roof of any one of the acts charged was sufficient to make out the offense"); *State v. White*, 48 Or 416, 421, 87 P 137 (1906) ("This court has repeatedly held that where a statute makes it a crime to do either of several acts stated disjunctively therein, all of such acts may be embraced in one count, using the conjunction 'and' where 'or' occurs in the statute.") Thus, evidence that defendant knowingly withheld necessary and adequate *food* from T is sufficient to prove the offense charged in the indictment, even though there is insufficient evidence to support a finding that he withheld necessary and adequate dental care from T.

The record also supports the conclusion that the defendant acted *knowingly* in withholding necessary and adequate food from both girls, and necessary and adequate dental care from G. The girls' severe malnutrition and G's severe dental problems were obvious, which supports a finding that defendant acted knowingly, *i.e.*, with a conscious awareness that the girls were not getting necessary and adequate food, and that G was not getting necessary and adequate dental care.[26] There was evidence in the record that

---

[26] The fact that G's dental problems were bad enough that a school counselor noticed it is like the child's obvious vision problem that the Court of Appeals addressed in *Drown*. There, the court had concluded that the evidence supported a finding that the defendant had knowingly withheld necessary and adequate care to address that vision problem. 245 Or App at 461-62. Here, G's dental problems were obvious, and the fact that the family qualified for dental coverage under the Oregon Health Plan permits a finding that defendant had the ability to access and provide for G's dental care and knowingly did not do so.

defendant chose to spend money on nonessentials instead of using his resources to provide food and dental care for his children. The record also supports the inference that defendant neglected the girls' personal hygiene, did not fully access available food resources or address the girls' poor school attendance, and did not use available Oregon Health Plan coverage to address G's dental needs. That evidence, considered in its entirety, permits the trial court's inference that defendant knew he had the ability to provide the necessary food—and to address G's dental problems—and acted knowingly when he, nevertheless, did not provide the girls with enough food to prevent severe and chronic malnutrition, and did nothing to address G's severe dental problems.

We conclude that there is sufficient evidence in this record to support the trial court's conclusion that defendant knowingly withheld necessary and adequate food from G and T, and that he knowingly withheld necessary and adequate dental care from G.

## III.   CONCLUSION

As we have explained, and consistent with our prior interpretation of that statute in *Baker-Krofft*, a person "withholds necessary and adequate food, physical care or medical attention" in violation of the first-degree criminal mistreatment statute, ORS 163.205(1), when the person "keeps back" food, physical care, or medical attention that is necessary to provide for a dependent person's bodily needs, and the person is able to access and provide the requisite food, physical care, or medical attention. As so interpreted, the statute does not "criminalize poverty," as defendant claims, because a person cannot be convicted of criminal mistreatment if the person does not have the ability to access and provide the food and care that is "necessary and adequate" for a dependent person.

Because the state has the burden of proving, beyond a reasonable doubt, that a person charged with criminal mistreatment has withheld necessary and adequate food, physical care, or medical attention from a dependent person, if the state does not prove that a defendant had the ability to access and provide necessary and adequate food and care

to a dependent child, that defendant cannot be convicted of criminal mistreatment. But that is not *this* case.

The evidence in this case was sufficient to support a finding that defendant *could have provided* necessary and adequate food and dental care to his young daughters. He knowingly chose not to do so, causing both girls to be chronically and severely malnourished and causing G to suffer from severe dental problems that made it difficult for her to eat, exposing her to infections and illness. That is enough to support a finding that defendant knowingly withheld necessary and adequate food from both girls, and dental care from G, in violation of ORS 163.205(1). Accordingly, there was sufficient evidence in this record to support the trial court's decision to convict defendant of two counts of first-degree criminal mistreatment.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.